The next case, call for oral argument in the interest of AP. Counsel? Thank you, your honors. May I please the court? I'm Craig Griffin from the law offices of Bill Milner in Salem, Illinois, representing the mother appellant in this matter. We were court-appointed to represent the mother in this appeal after she was represented by the public defender at the trial court level. The way this case gets here, actually, Ms. Centropi's daughter, AP, was taken from her back on September 11, 2009 after there were allegations that Centropi engaged in excessive formal punishment of her oldest son, DP. Also at that time, her two youngest children were also taken from her as well. As part of an agreement with the state, upon disposition of this case after the parties stipulated to adjudication, the two youngest children were returned to her care. That was around April of 2010, and they have remained in Ms. Centropi's care since that time. At that time also, the girl at issue in this case, AP, was returned to her mother, and she stayed with her for another few months until a domestic dispute between Centropi and her then-husband resulted in DCFS again taking the child from the home even though the child was not involved in a dispute of non-harm. And the child has been in protective custody since that time, residing in the home of Gina Renee Kay. Now, the way this gets here, actually, Your Honors, is the fact that Ms. Phelps admitted that during the first nine-month period following the adjudication of neglect or abuse, she didn't make reasonable progress. So she stipulated to unfitness on that ground, and this matter proceeded to a best-interest determination, again, before the trial court, which she was represented by the public defender. Our argument today, Your Honor, is that the finding of the trial court was against the manifest weight of the evidence. I'm aware, Your Honors, that this is a very high bar to cross, that this is something that you don't take lightly, overturning judges, because it was something that was in the statute of discretion of the court. But in this case, the record clearly demonstrates that the opposite result was the appropriate one. Whenever you go through, the statutory factor is enumerated for best-interest findings. Section 1-3, subsection 4.05 of the Juvenile Court Act, delineates the factors that the trial court should consider, and this court should consider, whenever making a best-interest determination for a child. And they go through ten different factors, and one of them has five sub-factors there. The first is the physical safety and welfare of the child, including food, shelter, health, and clothing. Nobody has ever alleged that Centro P is not going to provide a safe environment for her children. In fact, she has two other children in her care. She has her fiancé's three children in her care, as the record demonstrates. Nobody has ever taken those children from her in the time they've been there since, as I said, her two children were returned to her in April of 2010. She's provided adequate housing for her. DCFS has never said that her housing was bad. When she lived in Belleville, they went to her house and found her residence totally appropriate. She recently moved to St. Louis, and although DCFS didn't hold high on the quality of her residence over there because they didn't go to St. Louis, by all indications, her house over there is like it was in Belleville, only even more spacious, better off. She's moved up in the world. Nobody's alleged that she can't actually afford food or anything else because she does use government assistance, I will admit, but they've always gotten by. That's the important thing is that nobody says her children are starving or in danger or anything else. Now, the other thing, too, is the development of the child's identity. To me, this is a big one because AP was in her mom's care for the first nine years of her life. She clearly identifies with her mom. If you look at the in-camera interview done with her, if you look at the testimony of her social worker or therapist, I forgot what it was, psychologist, if you look at the testimony of even the foster parents, they talk about how the child identifies with the mother and that the child wants to go back home. And even you see where in the foster parents' own testimony where they talk about how if the child does not go back home, then we would like the doctor, seeming to recognize even that the appropriate thing to do is for AP to go back home because she identifies with mom. Third factor, the child's background and ties, including familiar, cultural, and religious ties. Again, whenever we talk about family, we talk about the mom who she spent nine years of her life with, the mom who she wants to return home to, a mom who does have a unique ethnic background and who she presumably would like to explore more of. And whenever you see, whenever she talks about Gene and Renee, she doesn't talk about them as mom and dad. She talks about her mom as her mom. Those are her familial ties, I can even call them. Whenever we talk about child's sense of attachments, and this is where I really think this is going down to the fourth factor, the first one there where it talks about where the child actually feels love, attachment, a sense of being valued. And it says in parentheses in the actual statute, as opposed to where adults believe the child should feel love, attachment, and a sense of being valued. This is where I believe the trial court erred. If you look at what the trial court said whenever it made its ruling as far as best interest, it actually was the same day as the best interest hearing because the court wanted to proceed with it because they knew this matter had been going on for a long time. And he goes on about how the missed visits, because the mom missed about half of her visits during the last year, which I will concede, that's true. Was it 22 visits and she showed up eight times? That's not half, is it? Let's see, I think there were 22. Missed 14. She missed 14, you're correct, there were eight. She showed up back. That's not half. Okay, I apologize, Your Honor. But so, yeah, she showed up at eight out of the 22, which is not a good track record in the trial court. And she was going to get free gas for transportation? That's an interesting point, Your Honor, as far as the gas card. And I believe the state even indicated with their questioning the first time she tried to get the gas card there was an issue with it, and she went back and she did, I believe, the record reveals received two gas cards from them, actually, one for $10 and one for $20. And Ms. Fels' testimony indicated that the $20 gas card never even worked, as I recall. And so she still never had the time, or she never actually had the opportunity to use that gas card. Obviously, when you're driving 100 miles from Belleville to Eppingham once a week, $10 of gas really doesn't cut it. Because it's 100 miles each way, it's 200 miles. Did she work or anything? She has not had a job for the last number of years. Actually, DCFS requests that she quit her job, and I believe the record reveals that, because they did not approve of what she was doing. She was actually working in an adult gentleman's club. I will say that one time. Pole dancer? I believe she was a bartender waitress there. But, Your Honors, DCFS didn't find that appropriate, and she did leave her job at that time.  so everything just kind of came together where she did leave it. So how long was the time when she left her job until the first time to go to Eppingham? I believe it was around a year, if I recall correctly, Your Honor. Because I believe she went through a pregnancy in there and stuff, too. Anyway, this is where I believe the trial court erred, though, because they talked about how the missed visits show that mom didn't love the child. The statute doesn't ask anything about whether or not mom loves the child. That's where the child feels the love. And whenever mom missed the visits, one of the things we see is AP sitting there asking why mom isn't there, also making up excuses for why mom couldn't come. Maybe she didn't have a ride. Maybe, you know, her car broke down. To me, that shows concern on the part of the daughter for the mother. I was a teacher before I was a lawyer, and I had students exactly like that who cared for their parents so much that they would come up with any excuse possible for things like that. And it shows because of the fact that they felt love from their parents, and things that didn't jive with that worldview of theirs just didn't make sense to them, so they would come up with any reason why. Because they felt that love, regardless of what anybody else thought they should feel. Because we could sit here all day and talk about how Centro Peace should have gone to each one of those visits every week. But at the same time, not everybody has the same privileges and opportunities in life that you and I have had. This past, well, the last two weekends, my nieces and nephews have had consecutive birthday parties on the other side of St. Louis, a hundred miles from where I live. And my sister asked me, why can't you come to Boca? Even I, with the comfort of my job and my career, I didn't have the money to be able to drive over there two different times. A hundred miles away. Each way. Two consecutive weeks. And she was asked to do that every single week, with very little assistance, with other children in her care, her fiancés. And keep in mind, her fiancé wasn't even able to go with her to help her with the children when she went, because DCFS explicitly prohibited him from going. So she would have had to get a babysitter. She would have had to do a lot of things. Why was that? Why was he prohibited from... DCFS decided that it was so late in this process that they weren't going to introduce any more individuals to AP. So he actually did show up once, and to his credit, whenever DCFS... This was at a McDonald's, so it was a public place. And DCFS asked that he leave, and because he rightfully so did not want to cause a scene in front of the children, he did leave and proceeded not to come back, because DCFS said that he was not welcome there. They have no concerns about his safety. Actually, the record reveals that he was... He's a police officer for the Alton Southern Railroad, and he is currently about to be a third-year law student over at St. Louis University. So somebody who's a law student working in law firms, a police officer, not exactly a safety-concerned kind of guy around children. So that's definitely not it. And we also talk about... I'll just kind of go on to the other factors here, because I know I'm up against the clock. The child's sense of security. The testimony reveals, actually, in AP's in-camera interview, that she feels absolutely safe with her mom, I think, or very safe, I believe is the exact quote, very safe with her mother. The child's sense of familiarity. She knew mom for nine years. She knew mom from visits. She always wanted to see mom. She made excuses why mom couldn't be there. She was familiar with her, and that shows her sense of familiarity with mom and her desire to go back. The continuity of affection for the child. I'm going to argue... I'm not going to... Obviously, I believe that AP feels affection for her mother. I believe that she feels affection from her mother, and the record reveals that fact. Obviously, I think that the foster parents do care for her, Renee and Gene K. But one of the things that jumped out to me from the record is that if Centropy's rights are terminated, she won't be able to be with her mother, be with her two youngest siblings that she would never see if her mom's rights were terminated. Now, if she were to go and stay with Renee and Gene K, she would be with her brother, her oldest brother, DP, but she would never see her mom and two youngest siblings. But one of the things that jumped out, as I was getting ready to say, is that DP, if he's Renee and Gene K, it looks like they are going to adopt him. We're not appealing any findings with respect to him. They've already stated they will do everything in their power to facilitate visits between AP and DP. So she would still get to see Renee and Gene K. She would still get to see DP. She would get to see her two youngest siblings. And she would get to see mom. She would have the continuity of affection of all of them as opposed to just her brother. And I think that that is very important. And the least disruptive placement alternative for the child, obviously she has been in this placement for three years. But at the same time, too, we've also seen a slide in her behavior whenever she saw her mom's rights about to get terminated. This is a very ripe girl record reveals that she's in gifted classes. And whenever you love somebody like that, you see yourself being ripped from them, obviously behavior issues erupt. Obviously you're going to act out. Obviously you're going to have problems. And it could even result in a slide in her grades. It could result in a slide in her demeanor, as we've seen with the behavior issues that Renee and Gene K testified to. And I think that creates a disruptive environment. And so the placement of Renee and Gene K, if it disrupts her life like that emotionally, I don't see how you can say that's the least disruptive placement alternative for her. Has the mother completed any of the counseling recommended by DCFS? Yes, actually she has. As I seem to recall, she went to substance abuse counseling on her own. And completed it? Yes, and completed it. That will be in the record? Yes, that is in the record. And I could probably give you the page number here if I flip back through my brief here a minute, because I know I cited the statement of facts. Let's see. She completed a substance abuse evaluation through the Community Resource Center in Centralia, Illinois, which determined that she did not need further substance abuse counseling. That was in page 336 of the record and 396 and 397 of the record. She began parenting classes with the Community Resource Center. Did she complete those? I do not believe so, because she was transferred to Christian Social Services. And she did have a break in services attributed to the birth of her youngest son and a lack of transportation after her move to Belleville. So she did not complete the parenting classes? No, but she did end up re-engaging those services this past November. And as of the time that my record is of the best interest hearing, the testimony revealed that she had been consistently engaging in individual parenting and domestic violence counseling services in Belleville since November of 2012. So up until the time, at least then, that's when my record's in and that's when your record's in, Your Honors. So I cannot feel fine about anything beyond that. Again, the focus here is, of course, on the interests of the minor. So even services, while I think they're important to show that the child is safe and in a good home, I don't believe that those are necessarily as positive in a best interest hearing because keep in mind, in a juvenile termination, you have a bifurcated proceeding where you have the first part of it, which is about parental fitness, and that's the part she stipulated because she did screw up during that first nine-month period, didn't engage in all of her services, as you talked about. And so when we're talking about best interests, we're talking about what's best for the child. And you don't think whether or not the mom has completed or gone to parenting classes or counseling has anything to do with the best interest of the child? I think it does have to do with it in the fact that we want to make sure the child's in a safe place and the mom is able to deal with her any issues the child may have after being in substantive care that long. It's great to be able to adequately talk to your child and counsel your child. It's great to make sure that you're not a danger to your child. Things like that obviously come into play in the best interest determination. But here, nobody's even made any allegations regarding whether or not she can adequately parent her child, whether or not children are safe in her care. As I said, her two youngest children have been in her care the entire time. Well, ever since May of 2010, or April of 2010. How old is AP now? AP should now be, I believe, about 12 years old. 12 or 13. How old's the oldest brother? The oldest brother is about a year younger than AP. And he's still in the foster home? Yes, he's still in the foster home. I believe they have an intent to adopt him. And that's one of the nice things, though, they said that if he's adopted and AP were to return, they would facilitate visits between the two of them, which would be awesome. That way she can maintain a relationship with mom, with her youngest kids, with her brother, everybody, and even the foster parents who she lived with. Obviously, she should maintain a relationship like that. Moving along here just quickly. The child's wishes and long-term goals. We saw that in the camera interview. And I know it's one thing to put weight on, or it's kind of puts you on shaky ground and put a lot of weight on a child's testimony, especially at 12 years old, that age group. But we're talking about a girl who's gifted. A girl who, obviously, is very bright, tests well. And two years prior, the court conducted a competency hearing to find out whether or not she was competent to testify. That very same court determined at the time that she was, quote-unquote, a slam dunk, I believe is the quote used, saying that there was no doubt she was competent to testify. Two years later, the same bright girl is there. I think that her testimony should be given weight. This isn't somebody that doesn't... Are you saying her testimony was not given weight? I don't think it was given great weight by the trial court, because, as the state argues in their brief, they say that her, or AP's testimony was based on basically wins of sorts, as far as, well, she doesn't like being disciplined by the law. I understand that in children. You always have to be on the lookout for it. But whenever you look at the type of discipline involved here by the foster parents and the ways that, by all accounts, they treat her, I understand her concerns. They talk about how she gets three to five pages of sentences for minor infractions, which, okay, that's fine. But she talked about how she gets 25 pages, front and back, of sentences for other infractions. She has to write while her hand hurts. You know, things like that are kind of disturbing to me, as far as punishment goes, or even where she testified to being, or I believe it's actually in one of the court zone exhibits where they have her journal, where she talked about being sent to bed and not allowed to do her homework as punishment. Who punishes their child by not allowing them to do their homework? To say that that's in the best interest of a child, I think, is definitely at least a stretch, because homework, I believe, is important, and to punish a child by not allowing them to do what they should do is counterintuitive and counterproductive. Um, as far as the child's community ties, including church, school, and friends, I will concede where the child has been for three years probably weighs in that favor, because she's not lived in St. Louis, where Cintra P. now lives. But at the same time, too, um, AEP in her own testimony doesn't seem to possess that strong of ties to that community, because she requested that if she was freed up for adoption, she didn't even want to live there. She wanted to go to some other place. Now, you mentioned that the housing in St. Louis was as clean and neat as was in Belleville. Yes. Well, what is that housing exactly? Where is it? Is it St. Louis City? Yes, St. Louis City, over on Gravelway, I believe, the record reveals. And it's a single-family home they bought, as I recall. Okay. And I want to say it has four apartments. The same square footage was in the house in Belleville? Same size as the location in Belleville? I think it's actually larger than the one in Belleville, Your Honors. So it's not any smaller. I believe it's either a four- or five-bedroom house where there's plenty of room for the children. She testified where AEP, I believe, might even have had her own room over there, for the most part, with the exception of weekends when her fiancé's children would come to stay with them. So, for the most part, AEP would even have her own bedroom there in the house, according to the record. Um, the child's need for permanence, which includes the child's need for stability and the continuity of relations with parent figures and siblings and other relatives. If AEP's rights are terminated with respect to AEP, AEP's never going to see her two youngest siblings. She's not ever going to see Mom again, the mom she knew for nine years. To say that that fosters the continuity of relationships is obviously inaccurate. Now, as far as with her parent figures, like let's say Renee and Jean Kay, her foster parents, if she's still getting visits with DP, she's still going to see them, so she would maintain a relationship with them. She could write them. She could call them. Whereas if Mom's rights are terminated, she's never going to see Mom again. She's not going to be allowed to. And thank you, Your Honor, for your time. Thank you. Excuse me. Thank you, Counsel. Thank you, Your Honor. It's probably, although these are all factors that are very important for importance required to consider, it's reluctant to say that we have to sit here and tick off factors to say, well, if there's one more, they go in one person's favor than the other, and that necessarily dictates the result. There are certain things that have responded as argued today, which I would certainly agree with. There's some things also I think were a bit glossed over and do need to be accentuated. As this Court's aware, the state's burdened by repondents of the evidence, and in that sense of that, it's a manifest weight determination with regards to whether the judgment should reverse. And that standard has often been defined as whether the circuit court's judgment is unreasonable, arbitrary, or not based on the evidence. And that's a highly deferential standard of review. And I think that's important because when you talk about cases like this where there's a lot of facts and factors that go in and they have to be balanced by the Court, it's important to know that this Court gives significant deference to the circuit in its findings. In that regard, there were a lot of considerations that the Court had to take into consideration. Now, this was a procedurally unusual case because the respondent admitted to the state's petition alleging unfitness. And so it proceeded strictly to a determination of best interest. What we do have is a situation where we arise and we have two things that the Court has to look at. We have to look at the mother, but we also have to look at where the child is currently. And these are all things that I think are taken together to look at the child's best interest. Because certainly when the considerations before the Court are to decide whether or not this child should go back to the mother, it needs to be decided whether that event is going to be in the child's best interest. And that will necessarily entail some evaluation of the mother's circumstances. Now, we have a situation where it's been conceded that the mother had missed 14 of the last 22 visitations. That's a considerable amount and that is perhaps one very large factor that the Court took into consideration. You'll see from the record that the mother professed to have memory problems. That's a particularly troubling aspect of this as well. What did that relate to, or how did that in what context did that come about? I think it had more to do with remembering certain dates. Okay. With respect to missing visitation? I'm sorry? With respect to missing the same visitation? I don't know if it was the visitation specifically or it had to do with perhaps interaction with DCFS. I'm not certain. But she did sort of say that this is a characteristic that she's suffered from. And that may be true. But the fact of the matter is that she did miss all these visitations. And that's one thing that the Court focused upon. And I think it's an appropriate focus because it also demonstrates a certain degree of parental acknowledgement of a responsibility towards a minor. And you have to look at that and then you have to also look at the fact that the response of the mother has not completed the counseling. I agree with the mother's attorney that she did get a substance abuse evaluation and was found that she did need further counseling. That stemmed from a drug offense that had occurred earlier. And that's fine. I agree with that and I have no problem with that. But there are also issues with regards to parenting skills and things that she had not completed. And we're talking about cases where we're not just one or two or three months into this whole process. We're three years into this process. And so when we talk again about parental responsibility and the ability of a parent to undertake those tasks that are necessary to be a proper parent for a child, and that is certainly a significantly important consideration, a child's best interest, that's an important factor to consider as well. With regard to the gas card, I profess I don't remember a record where it was testified that she actually got and used the gas card. If that's true, then that's I may have missed that. Because there was a lot of discussion I know in terms of the argument in the case about how the mother did not take advantage of the gas card and that there were problems that DCFS had had with her in attempting to offer this service for her to help her engage in visitation or whatever the case may be. Now, by all appearances, it looks like that she is living in a nice home in St. Louis. I don't know if it's bigger than the foster parent's home or not, and I think it's wrong to sit here and say, well, our house is bigger and therefore better. But I would admit that the house does appear to be nice. But there are also certain factors underlying this that need to be taken into consideration. She's living with a man she's not married to. So I have no reason to doubt her current situation of being the man's fiancée, and perhaps that will lead to something more. But it hasn't yet. And so there's a tenuousness to this relationship that hasn't fully consummated to say that that won't change sometime in the future. I don't think it takes any stretch of the imagination to see the engagements fall apart. She's not employed. Now, I think the respondent's correct that she had been probably told because of the particular milieu where she worked to not work there. I don't know if she was told not to ever get a job. It doesn't make a lot of sense to me. But that being the case, she leases this particular junction where her badly-invested interest was not employed. She was receiving Illinois  although she doesn't live in Illinois. Now, whether that's welfare fraud, I suppose, is another issue altogether. But there was no denying that she was receiving linked benefits. She was no longer a resident of the state of Illinois. For a court to ignore that particular circumstance, I think, would be a dereliction of the court's duty. So these are a lot of the factors that the court had to take into consideration with the mom's circumstances. She had some positive attributes. We'll get into the mother's relationship with AP here in a moment. But we also have to take a look at where she's at right now. She's living with Renee and Gene, and these are, by all indications and records, two extraordinary people. They had not only had AP in them, who was a very bright, gifted child, but they had her brother, who is a very disturbed child, and in fact at the time of this hearing was hospitalized for treatment. And it wasn't just those two. They had two other foster care children. Cheyenne and Cheyenne's brother's name eludes me at the moment. The brother also had a significant behavior disorder. These foster parents, they took care of these children. They took them to counseling. They gave AP to counseling. They worked with the counseling to help AP go through these things. So this is a home environment where there are people who appear to be of relatively modest means, but they go to extraordinary lengths to take care of these children, and that doesn't come about anything other than a purely altruistic attitude about really caring for children. That they may be disciplinarians in that, and that heaven forbid they make someone right until they get a hand cramp, doesn't show that they're bad parents. I think it's very wrongly insinuated here. I think it shows that they are significantly concerned enough that they want their children to adopt to a certain behavior standard, which apparently, I'm not sure that AP sees that type of structure with coming from her mother giving her comments about the relative environment. She's in a home where she is an excellent student. She's heavily involved in extracurricular activities, a whole string, a very impressive string of sports and things of that nature. She has a small group of friends that it appears that she's very attached to, and she's also living with her brother, DP, who she clearly, deeply loves. And will be, hopefully it appears, by all facts available, will be also adopted by Renee and Jean. Now, what's interesting about this, of course, is that I think the respondents in the state actually look at some of the same factors and sort of spin them differently. I want to talk about one factor here, because I think this is something that became something of prominence, and that was the testimony of AP. AP, and it's very unusual. I've done a lot of these cases, and I can't recall the last time I've actually seen the minor question and articulate preferences. And there's no doubt, and I will admit here that she said, boy, in the balance, I would choose my mom. Now, I would counterbalance that to some degree, that there was testimony from the counselor and from the DCFS worker that that attitude sometimes shifts and that she really seems sort of conflicted about who she really preferred to be with. And so it's not a clear-cut answer to say, I hate my foster mother, and I love my mother. She loves her mother. I prefer my mother running out on the surface. That being the case, though, I think when you really, when you read this, I personally was just struck by the answers as being very typical of the maturity level of an 11- or 12-year-old. The reasons stated for preferring your mother weren't as one would hope they would be or imagine they would be if this is going to become an important consideration. My foster parents don't care. My foster parents don't pay any attention to me. They don't take me to sporting events. They don't provide me a hot meal. No, but what was the reason? She's mean to me because she acts nicer to Cheyenne than she does to me, and sometimes I get punished for that, which I think happens in pretty much every household. So I'm not going to minimize completely the significance or the weight that she plays to this. Obviously, she's stating what she's allowed to state, and it's there for the court to consider, and I certainly think the court did consider that, but I think it has to be considered in the context of the type of statements that she's making, whether that's really an articulation of facts that demonstrably shows that your best interests belong with her biological mother rather than the foster parents. I don't want to go through all of these factors in 705. Yes, they're all in the briefs, and it just unnecessarily prolongs it. I'm going to synopsize very quickly by saying this. When you look at the balance of the factors, and these factors that the court states upon, what we have here is a very stable, a very loving environment by two very dedicated and very hardworking people who have committed themselves to not only the child and that with whom she's developed an extraordinary relationship, I would say perhaps even stronger than she has with her own mother. And while it's true, as the respondent argues, that foster parents have indicated that they would do what they could if they no longer had the need and the care to see the children, to hold that against the foster parents in some way is not really right. It's not necessarily what he's saying, but I think that the consideration that it somehow means that the child is better off with the mother, I think you're looking at two people who want to do everything they can for AP to make sure that she's happy. So there's really two ways of looking at that. And it should be given equal consideration in that regard. But she's in a very stable environment, heavily involved in extracurricular activities. She's developing nicely. She's in a good family relationship with siblings. I know she quarrels with Cheyenne, but there's also testimony in the record that they sometimes do girly things together. How old is Cheyenne? Do you know? I don't recall. I'm sorry. She's older than AP, as I understand it. And in that regard, she's sort of looked at Cheyenne as sort of a mentor, if you will, in the girly things that they talk about. Exactly in that way, sir. But for the most part, it's a normal sibling relationship. There's ups and downs in the perceptions of someone getting better treatment than me. And I'm sure my sister and I went through this lots of times as the older brother. Now, with regards to, of course, disruption of the home environment, what we have is a mother who, while she clearly loves her daughter, and I think the daughter clearly loves her, is in a home environment, which I talked about, which is good, but perhaps not reliably good in the sense that we know it's going to be there. She's not employed. She's got memory problems. She's missed numerous visitations. She hasn't completed counseling. There's a lot of factors in this, of course, you simply cannot ignore, which brings a lot of warning signs when you balance. Because I think this is a balancing test. Some people respond, and it glosses over in this case. It isn't just what the mom wants and what the mom feels and how that relates to the minor's best interests and what's best for her. It is all the factors that come into play here. Because that's what you have. She's been in a foster care environment for the exception of two months with the Renee and Jean. And it's demonstrably obvious that this has been a good environment for her. And there has to be counterbalance of what kind of environment can you reasonably and reliably believe that she's going to be in when she goes back to her mother. And certainly there's going to be a disruption involved here because, and it's not necessarily only because she had been in foster care for three years and then goes to live with her mother, but she's going to be in a new environment, in a new home, and with people that she's not familiar with. And I think that that is a minor, but still a consideration that the court has to take into regard. And I do think in the sum, too, the child need for permanence is a very important consideration as well. And permanence has to be viewed in the context of where the mother's status is at right at that point. And I've ticked off these certain considerations that the court had to consider. And the child need for stability and continuity in relationship with parent figures and siblings and other relatives, I accentuate the relationship with DP at that point. Now, the respondent makes the argument that it could mean and will mean that AP won't have a relationship with these other siblings that currently reside with the mother. And that may very well be true. But again, we are engaged in a test of which we balance things. And as far as I can tell, AP doesn't really have any relationship with these two children. And while they are siblings, you have to look at the relationship that she does have with DP. And it's been remarked upon numerous times about what a close relationship that was. And to say that being taken from that would not be disruptive to AP, I think, is disingenuous at best, even if you say, well, they can see each other every now and then. I don't even know what that means. How often does that happen? So, I think that while the respondent makes many good points, this is, again, a manifest way to the evidence. This is a deference to the circuit court's assessment, and there's ample evidence in this case which cannot lead to a conclusion that is arbitrary, unreasonable, or not based on the evidence. It's clearly based on the evidence. And given that standard review and level of deference, it just simply is not enough here to be able to reliably say that the circuit court erred in its evidentiary weight in finding that it was in AP's best interest that she remain with the foster parents that had their own lives determined with regards to the respondent. I believe that's all. Any questions? I don't believe so. Thank you, counsel. Thank you, Your Honor. Very briefly here. With regards to the factors that the state enumerates where they say, where they basically suggest that centripede might not be able to care for AP, I again want to point out that Centripede has had her two youngest children in her care constantly from May of 2010 on, or April of 2010 onward. And even before that, they were only away a couple of months. Never were they taken away after that point. Never has there been any reports or anything else that would even give anybody one idea to think that these children are in danger, that she can't provide for them, that she can't care for them, that she can't adequately feed or house them. That's never come up in this case. Those children have been there the entire time. It's presumed that she is fit to parent children. That she can have them in her care safely. Because otherwise DCFS would have intervened. They had the ability to go in and take those children if they wanted to, if those children were in any kind of harm. They watched her very closely. And they knew those children weren't in harm's way. So I think it is unreasonable to suggest that AP would be facing any kind of harm, any kind of malnourishment or lack of housing if she were to be taken back to CentraP or to CentraP's home. The last couple of things here, again, the missed visits. The court went so far at the trial court level to say that it has found CentraP absolutely not credible when she said that she loved her children. Actually said that she was not credible when she said that she loved AP just because of the missed visits. That has nothing, and it says that the missed visits was a large factor when determining whether or not to terminate parental rights. What I ask this court is which of the statutorily enumerated factors do the missed visits tie into? Because what the statute asks for with respect to love is not whether or not CentraP loves her child. We can argue about the absurdity of the trial court's proliferations regarding whether or not CentraP loves her child all day. But what the statute sets forth is a subjective standard. It asks, where does AP actually feel love? We have to get inside AP's own mind. We have to think like her and feel where she feels love. Not what we think she should feel love. The statute explicitly says not what we think she should feel love. That would be an objective standard. This is a subjective standard. Where does she feel love? And that requires us to think like her. And I think the record clearly demonstrates that she feels love from her mother. And the last thing I would like to bring up is the state argues that in this case, it's not arbitrary to have the trial court's ruling in this case. What I would argue, Your Honors, is that why is it okay for two children to be with her but not the other one who's older, presumably can take care of herself better, and a very gifted child that has no special needs like DP? That's why CentraP, knowing that it was in DP's best interest to be elsewhere, went ahead and signed surrenders on him because she knew that was in his best interest. He had special needs that she really couldn't take care of. AP's an entirely different story, Your Honors. In this case, there's nothing to suggest that she should be terminated with respect to AP, that it's in AP's best interest that she be elsewhere, but not the two younger children. And that, I think, makes it arbitrary to say, why is it okay for two children to remain but this one we're going to take away? There's no logical coherence to it. And I think that does make the trial court's order arbitrary. And that's about all I have, Your Honor. Do you guys have any questions, or do Your Honors have any questions for me? I think we've asked them. Thank you, Counsel. Thank you, Your Honors, and I yield back my time. Thank you, Counsel. We appreciate the briefs and arguments of both Counsel to take the case under advisement. We'll take a very short recess and then have the remaining case scheduled for this morning for argument.